## STATE OF CONNECTICUT *v.* ANGEL GUADALUPE
## (AC 20219)

Foti, Schaller and Dranginis, Js.

Argued September 10—officially released November 13, 2001

*Jeffrey D. Cedarfield,* with whom, on the brief, was *Patrick Tomasiewicz,* for the appellant (defendant).

*David M. Greenberg,* certified legal intern, with whom were *Rita M. Shair,* senior assistant state's attorney, and, on the brief, *Scott J. Murphy,* state's attorney, and *Mary Rose Palmese,* assistant state's attorney, for the appellee (state).

*Opinion*

FOTI, J. The defendant, Angel Guadalupe, appeals from the judgment of conviction, rendered after a jury trial, of the crime of criminal impersonation in violation of General Statutes § 53a-130.[1] On appeal, the defendant claims that the state failed to present sufficient evidence to support his conviction and that the trial court improperly denied his motion for a judgment of acquittal. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. At the time of the incident underlying this appeal, the defendant was a surety bail bondsman and owned a bail bond company. Part of his livelihood included working as a bail enforcement agent, apprehending individuals who failed to appear in court after having posted bond through him. The defendant previously had been employed by another bail bond company.

On the evening of October 23, 1998, the defendant was working as a bouncer at Sports Palace, a bar in New Britain. Although it was not his regular job, the defendant agreed to work as a bouncer that night, without pay. He did so as a favor to the bar's owner and because he was looking for someone who had skipped his bail and who, the defendant believed, might patronize the bar that evening. As a bouncer, the defendant

---

[1] General Statutes § 53a-130 (a) provides in relevant part: "A person is guilty of criminal impersonation when he . . . (3) pretends to be a public servant other than a sworn member of an organized local police department or the Division of State Police within the Department of Public Safety, or wears or displays without authority any uniform, badge or shield by which such public servant is lawfully distinguished, with intent to induce another to submit to such pretended official authority or otherwise to act in reliance upon that pretense."

The state also charged the defendant with one count of reckless endangerment in the first degree in violation of General Statutes § 53a-63, one count of threatening in violation of General Statutes § 53a-62 and one count of breach of the peace in violation of General Statutes § 53a-181. The jury returned verdicts of not guilty on each of those counts.

was responsible for checking patrons' identifications, searching patrons for possession of weapons and collecting a cover charge for admission into the bar.

On that same evening, detectives from the statewide narcotics task force, assisted by members of the state liquor commission and officers from the New Britain police department, were conducting an undercover operation to investigate and raid several local establishments, where they suspected underage drinking and narcotics use might occur. Sports Palace was one of the establishments suspected as being a site of such activity, and it was a target of the investigation that evening. The task force's plan was to send undercover detectives into targeted establishments to conduct observations and then to conduct a raid of the establishment with uniformed police officers to arrest any persons who were violating the law.

At approximately 9 p.m., Detectives Ian Case, Matt Barnwell and David Diaz, all members of the task force, wearing civilian clothing as part of the undercover portion of their investigation, drove an unmarked Ford Mustang to Sports Palace. When the three men approached the entrance to the bar, they encountered the defendant. The defendant searched Case and found a gun tucked in his clothing. After the defendant asked to see a permit for the gun, Case told the defendant that he did not want to enter the bar, and the three detectives returned to their vehicle, parked about fifty feet away from the bar.

Case sat in the driver's seat of the vehicle and notified officers that the group had failed to enter the bar, and that uniformed officers should nevertheless raid the bar. At that time, Barnwell squatted down near the passenger door of the vehicle and conversed with Case through an open window. Diaz stood alongside a nearby fence. The defendant observed the activities of the three

detectives and became suspicious of them. The defendant left the entrance to the bar and went to the trunk of his vehicle, parked approximately thirty feet behind the detectives' vehicle. He retrieved a gun, handcuffs and a badge that his previous employer had issued to him. He intended to intimidate the detectives into leaving the area. The defendant then ran toward the detectives' vehicle, pointing both his gun and his badge at Case, and yelled, "[P]ut your hands up in the air." Barnwell ran to the front of the vehicle to take cover while both Case and Diaz attempted to defuse the situation by telling the defendant that they were police officers.

The defendant walked toward the front of the vehicle and found Barnwell crouched down in front of the vehicle. By that time, Barnwell had drawn his gun, and both he and the defendant were pointing guns at one another. Two uniformed New Britain police officers, Rodney Williams and Daniel McAloon, arrived on the scene and came upon the standoff. Both officers noticed the defendant pointing his gun and badge at Barnwell. Both officers told the defendant several times to drop his weapon. McAloon realized that he knew the defendant, and it was not until he shouted, "Angel, drop the gun," that the defendant obeyed the officers' orders. Thereafter, the officers arrested the defendant. Additional facts will be set forth as necessary.

On appeal, the defendant argues that the court improperly denied his motion for a judgment of acquittal because the state failed to prove beyond a reasonable doubt that the badge that he displayed during the incident was one that lawfully distinguished a public servant. Specifically, he argues that the evidence adduced at trial concerning his badge did not support, but, rather, refuted the jury's finding that his badge lawfully distinguished him as a public servant for purposes of § 53a-130. In that regard, he argues that the evidence demonstrated only that the badge "looked like a law enforce-

ment agent's badge" or that the badge identified the defendant as a fugitive recovery agent. He argues that neither of those findings sufficiently supports his conviction.

We first articulate the familiar standard of review applicable to the defendant's claim. "In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . In conducting this review, the probative force of the evidence is not diminished where the evidence, in whole or in part, is circumstantial rather than direct." (Citation omitted; internal quotation marks omitted.) *State* v. *Carter*, 64 Conn. App. 631, 636, 781 A.2d 376, cert. denied, 258 Conn. 914, 782 A.2d 1247 (2001).

We next define the essential element that is involved in this appeal and that is integral to the crime of which the defendant stands convicted. The relevant portion of § 53a-130 (a) (3) provides that a person is guilty of criminal impersonation when he or she "pretends to be a public servant other than a sworn member of an organized local police department or the Division of State Police within the Department of Public Safety, or wears or displays without authority any . . . badge . . . by which such public servant is lawfully distinguished, with intent to induce another to submit to such pretended official authority or otherwise to act

in reliance upon that pretense." This court in *State* v. *Giorgio*, 2 Conn. App. 204, 209–10, 477 A.2d 134 (1984), determined that the definition of "public servant" in General Statutes § 53a-146 (3) applies to § 53a-130. Section 53a-146 (3) provides that a " '[p]ublic servant' is an officer or employee of government, elected or appointed, and any person participating as an advisor, consultant or otherwise, paid or unpaid, in performing a governmental function." Section 53a-146 (4) provides that " '[g]overnment' includes any branch, subdivision or agency of the state or any locality within it."

In the present case, the state bore the burden of proving the following elements beyond a reasonable doubt: (1) the defendant displayed a badge; (2) the badge was of such nature that it would lawfully distinguish its holder to be a member of the class of persons described in the statute; (3) the defendant lacked any authority to display the badge; and (4) the defendant displayed the badge with the specific intent to induce another to submit to such pretended official authority or otherwise to act in reliance on such authority. The defendant concedes that he displayed a badge during the incident and does not address the third or fourth elements. Accordingly, our analysis concerns whether the state satisfied its burden of proof for the second element of the offense.

At trial, the detectives and officers involved in the incident provided detailed testimony about the defendant's badge. Diaz testified that the defendant held "some type of gold badge [with] gold coloring." McAloon testified that the badge that the defendant used looked very similar to his own police badge. Williams testified that although he knew at the time of trial that the defendant's badge was inscribed with the words "special agent," he did not know the specific type of badge that the defendant possessed at the time of the

incident. He testified that at that time, the badge appeared to be a law enforcement badge of some type.

During redirect examination, McAloon displayed his own New Britain police department badge, and held it next to the defendant's badge and testified as to their similarities. The defendant testified that his badge did appear to be similar "in color" to McAloon's badge, but that his badge was not similar "in symbol and what it says." He further testified, however, that he was not certain if such details would be distinguishable from a distance of more than ten feet. Peter Torres, who worked at the door of Sports Palace on the night of the incident and who witnessed much of the incident, testified that he saw the defendant remove his badge from his trunk, but that he could not see the exact type of badge that the defendant displayed that evening.

After reviewing the record, we conclude that the jury had before it adequate evidence upon which to find that the defendant displayed what appeared to be a lawfully issued badge for a member of the class of persons described in § 53a-130. We reach that conclusion on the basis of the witness' perceptions of the defendant's badge during the incident and the factual scenario in which the defendant displayed it. We reiterate that this court is bound to construe the evidence presented in support of this element of the crime "in the light most favorable to sustaining the verdict." (Internal quotation marks omitted.) *State* v. *Bradley*, 60 Conn. App. 534, 540, 760 A.2d 520, cert. denied, 255 Conn. 921, 763 A.2d 1042 (2000). In this case, it would have been appropriate for the jury to have considered the distances between the detectives and officers, and from the defendant during the incident, the time of day when the incident occurred, the circumstances under which the defendant acted and the manner in which the defendant displayed his badge. It would be neither unreasonable nor irrational for the jury to have concluded that

the defendant displayed a badge that appeared lawfully to distinguish him to be within the large class of persons described in the statute and that he intended to induce others to submit to this pretended authority.

Our case law reflects the expectation that jurors will not only weigh conflicting evidence and resolve issues of credibility as they resolve factual issues, but also that they will consider evidence on the basis of their common sense. Jurors are not "expected to lay aside matters of common knowledge or their own observation and experience of the affairs of life, but, on the contrary, to apply them to the evidence or facts in hand, to the end that their action may be intelligent and their conclusions correct." (Internal quotation marks omitted.) *State* v. *Valinski*, 61 Conn. App. 576, 582, 767 A.2d 746 (2001). In that light, the court properly instructed the jurors that they were free to "draw reasonable and logical" inferences from the evidence before them.

Although the defendant argues that the only reasonable finding supported by the evidence was that the badge looked like a law enforcement agent's badge or that it was a fugitive recovery agent badge, we conclude otherwise. Witnesses testified not only that the badge looked like a law enforcement agent's badge, but that they were unable to tell what type of badge the defendant was displaying during the incident. The jury could infer reasonably, on the basis of the aforementioned factors, that the defendant displayed what appeared to be a badge that any number of public servants might lawfully carry.

The defendant also argues that the statute required the state to "prove that the badge displayed by the defendant identified him as a public servant and did so by means prescribed by law." He further argues that "in order for a badge to lawfully distinguish a public servant, it must identify the bearer as such and must

do so in a manner prescribed by law." In that regard, the defendant posits that the state was required to prove that his badge was an authentic badge in the sense that it was a badge that lawfully distinguished its bearer to be of the class of persons described in the statute.

Our interpretation of the statute is to the contrary. The defendant in *State* v. *Giorgio*, supra, 2 Conn. App. 204, the recipient of an honorary deputy sheriff's badge that conferred on him no power or authority, stopped the victim in that case as she drove on Interstate 95 in New Haven. After he approached her car, he flashed his silver badge at her and told her she had been speeding. While considering the issues before it on appeal, this court stated that "[t]he defendant's contention that the state was required to prove *which specific public servant* the defendant was impersonating [was] baseless." (Emphasis added.) Id., 211. The defendant submits that *Giorgio* is inapposite, arguing that it concerns only that portion of § 53a-130 (a) (3) that deals with individuals who pretend to be public servants. We do not interpret *Giorgio* or the statute so narrowly.

When interpreting statutes, we afford statutory language its plain and ordinary meaning and "refrain from reading into statutes provisions that are not clearly stated . . . ." *State* v. *Stewart*, 64 Conn. App. 340, 349, 780 A.2d 209, cert. denied, 258 Conn. 909, 782 A.2d 1250 (2001). The court must also use its common sense and "avoid a consequence which fails to attain a rational and sensible result which bears most directly on the object which the legislature sought to obtain." (Internal quotation marks omitted.) *Visco* v. *Cody*, 16 Conn. App. 444, 448, 547 A.2d 935 (1988). Likewise, "the court must use common sense in construing statutes and must assume that a reasonable and rational result was intended by the promulgating legislature." (Internal quotation marks omitted.) *State* v. *Harris*, 32 Conn.

App. 831, 840, 632 A.2d 50 (1993), appeal dismissed, 230 Conn. 347, 644 A.2d 911 (1994).

We do not interpret § 53a-130 to require the use of an official, or real, badge. During oral argument, the defendant conceded that the use of an "identical replica," though not officially issued, would give rise to a conviction under the statute. That reflects the inherent difficulty in interpreting the statute in the manner that he suggests while still interpreting the statute to achieve its logical and rational ends. The goal of the statute is to prohibit criminal impersonation. Among other things, the statute prohibits an individual from using a badge with the intent of inducing another to submit to authority that he or she does not possess. Because the state proved beyond a reasonable doubt that the defendant used a badge that appeared to lawfully distinguish him and that he used the badge in the manner proscribed by the statute, we are unable to see how the issue of the badge's lineage or authenticity bears on the goals that the legislature sought to achieve.

The judgment is affirmed.

In this opinion the other judges concurred.